**UNITED STATES of America, Appellee,**

v.

**Robert J. VEZINA, Defendant–Appellant.**

**Docket No. 98–1193**

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1998.

Decided Jan. 21, 1999.

Roger W. Wilcox, Jr., Buffalo, N.Y. (Paul J. Cambria, Jr., Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Buffalo, N.Y., on the brief), for defendant-appellant.

Paul J. Campana, Asst. U.S. Atty., Buffalo, N.Y. (Denise E. O'Donnell, U.S. Atty., Robin D. Barovick, Student Intern, Buffalo, N.Y., on the brief), for appellee.

Before: NEWMAN, LEVAL and PARKER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal concerns the sufficiency of evidence to support a finding of criminal contempt of an injunction, a matter that is often, as in this case, related to the precision of the injunction alleged to be violated. Robert Vezina appeals from the April 8, 1998, judgment of the United States District Court for the Western District of New York (Richard J. Arcara, District Judge), convicting him of criminal contempt for violating a temporary restraining order ("TRO" or "the Order") and sentencing him to five months of incarceration.

We conclude that the evidence is insufficient as a matter of law to support the conviction beyond a reasonable doubt. We therefore vacate the contempt conviction.

### Background

Because this appeal concerns sufficiency of the evidence, the facts must be set forth in some detail. Simplex Time Recorder Co. manufactures, sells, and services commercial fire and security alarm equipment for installation in buildings. Simplex has approximately 115 offices throughout the country, including one in Buffalo, New York. In 1994, three salesmen sold fire alarm equipment for the Buffalo office: defendant-appellant Robert Vezina (the most successful), David Ring

(a new arrival at the Buffalo office), and William Blanchard. Vezina had worked at Simplex since 1986. Ring handled sales to educational facilities and non-contractor "end-users." Vezina and Blanchard were responsible for sales to electrical sub-contractors; they submitted bids for fire alarm work to subcontractors who were submitting bids for electrical work to general contractors. It was Simplex's policy to offer the same bid price to all electrical subcontractors bidding on the same job. Gordon & Zoerb Electric ("G & Z") was one of the subcontractors to which Vezina was assigned.

Some time in 1994, Vezina decided to leave Simplex and go into business on his own as a distributor of Notifier fire alarm products, a brand competing with Simplex. With a partner, Michael Murphy, Jr., he incorporated a new company, Life Safety Engineered Systems, Inc. ("Life Safety"), and entered into a distributorship arrangement with Notifier. Vezina made arrangements with Notifier and incorporated Life Safety before resigning from Simplex.

In June 1994, Wittburn Electrical ("Wittburn"), a subcontractor, contacted Ring at Simplex, seeking a bid for fire alarm work for the Buffalo Hearing and Speech Center ("BHS"), in order to prepare its own bid for electrical work on the BHS contract. Because Wittburn's bid described BHS as a "learning center," Ring thought the job was within his purview, and he therefore went to the jobsite and performed a price calculation according to Simplex procedures. Ring then consulted with Vezina about the proper discount to be applied to his initial calculations. Ring told Vezina that the bid was for the BHS job. Ring then submitted the discounted price, about $11,000, to Wittburn. Unknown to Ring, many other electrical subcontractors were also bidding on the BHS project. G & Z, one of Vezina's customers while he was employed at Simplex, was eventually awarded the electrical work subcontract, in part on the basis of a fire-alarm bid from Simplex prepared by Vezina shortly before his resignation on July 25 (all dates are for 1994, unless otherwise indicated). That bid remained open during all the relevant events of this case; neither Vezina nor Simplex ever received a response from G & Z to the Simplex bid.

The general contractor on the BHS project, ADF Construction, anxious to have a minority-owned firm participate in the project, advised American Rated Cable ("ARC"), an electrical sub-subcontractor, of the possibility of becoming involved in the BHS job. ARC contacted a number of fire-alarm distributors, including Simplex, for bids on the fire-alarm component of the job. On August 8, Ring worked on the bid to ARC, not knowing that this was the BHS job; he quoted a price of $9,800. ARC had never handled a commercial fire-alarm job before and was previously unknown to all the salesmen in this case.

Contemporaneous with this bidding activity, Simplex brought a civil action in the Western District against Life Safety, Vezina, and Murphy, alleging breach of fiduciary duty, breach of employment agreement, fraud, conspiracy, and unfair competition. Among many other misdeeds, Simplex alleged that Vezina, while still a Simplex employee, conspired with Murphy to form Life Safety in order to compete unfairly against Simplex. Simplex further alleged that Vezina stole trade secrets and proprietary confidential customer information. On August 26, Judge Arcara issued a TRO that prohibited Vezina from

> soliciting the business of, or otherwise dealing with, companies having open quotations with Simplex, with such prohibition being limited to the projects referenced in Simplex's open quotations[.]

The TRO was periodically extended until December 19, at which time it was superseded by a preliminary injunction. On an appeal by Vezina and others, this Court affirmed by unpublished summary order. *See Simplex Time Recorder Co. v. Life Safety Engineered Systems et al.*, Nos. 95–7046(L), 95–7140 (2d Cir. Oct. 18, 1995).

After ADF Construction awarded the electrical contract for the BHS job to G & Z, it encouraged G & Z to involve ARC in the work. On September 6, ARC's chief operating officer, Richard Cummings, met with G & Z's chief operating officer, Charles Gordon, to discuss the possibility of working on the

BHS fire-alarm system. To assist Cummings in obtaining bids for fire-alarm work, Gordon referred Cummings to Vezina (then no longer at Simplex) and to Simplex.

On September 7, Cummings contacted Vezina, indicating that he sought a bid for fire-alarm work on the BHS project. Vezina visited G & Z's office in an attempt to discover "what the deal was" in regard to ARC's involvement with the project and to review the specifications for the BHS project. Vezina then quoted Cummings a price by phone and later by fax. Vezina's fax, offering a total price of $8,300, began, "We are pleased to quote on the following fire alarm equipment for the Gordon & Zoerb job you are working on...."

Though he did not know it, Vezina had almost no chance of winning the fire-alarm contract. The BHS engineers had specified three possible models of fire-alarm equipment, including Simplex but excluding Notifier. At some point during September 1994, Gordon told Cummings that one of the three specified models would be preferable. Accordingly, in October 1994, Cummings sought a quote from Simplex for the BHS job. He spoke with Blanchard, to whom he indicated that he had a quote from Vezina at Life Safety.

In response to Blanchard's inquiry whether Cummings was talking about the same project for which Vezina had quoted a price, Cummings faxed Blanchard the first page of Vezina's fax, omitting the price quote in order to preserve Cummings's negotiating position and adding the name of the project. In further negotiations, Cummings revealed Vezina's price to Blanchard. Cummings's strategy proved successful. Eventually, Blanchard lowered the Simplex price to $8,500, and Cummings accepted this offer.

During the week of November 13, Cummings informed Vezina that he had decided to accept Simplex's offer, explaining that the BHS project had not included Vezina's Notifier brand among eligible products. Vezina replied that he was glad that he had helped Cummings obtain a lower price from Simplex.

As a result of these events, the District Court, on Simplex's application, issued an order requiring Vezina to show cause why he should not be held in contempt for violating the TRO; the order alleged three separate violations, including the BHS project. On December 15, the District Court referred the contempt matter to the U.S. Attorney for investigation and possible prosecution, advising that the maximum sentence would be six months' imprisonment or a $5,000 fine (below the punishment level requiring a jury trial). After investigation, the U.S. Attorney's Office decided to prosecute Vezina only for the conduct related to BHS. In August 1995, the U.S. Attorney filed a Notice of Criminal Contempt, charging Vezina with violation of 18 U.S.C. § 401(3) for disobedience of the TRO. After a bench trial, Judge Arcara found Vezina guilty of criminal contempt and sentenced him to five months' imprisonment.

## Discussion

■ To secure a conviction for criminal contempt of a court order, the Government must prove (1) the issuance of the order, (2) the defendant's disobedience or disregard of the order, and (3) the defendant's knowledge and willfulness in disobeying the order. *See United States v. Cutler,* 58 F.3d 825, 837 (2d Cir.1995) ("Criminal contempt generally 'requires a specific intent to consciously disregard an order of the court.'") (quoting *United States v. Berardelli,* 565 F.2d 24, 30 (2d Cir.1977)).

■ The TRO prohibited Vezina from "soliciting the business of, or otherwise dealing with, companies having open quotations with Simplex," and the scope of the TRO was limited to projects "referenced in Simplex's open quotations." Since Simplex had an open quotation with G & Z for the BHS project, the project limitation was satisfied.

It is clear, however, that the evidence does not suffice to convict Vezina for violating the TRO's prohibition against "soliciting the business" of companies having open bids on the BHS project. Although the TRO did not make this clear, we assume that its proscription would apply only to subcontractors with open bids from Simplex at the time of Vezina's resignation. The evident purpose of the

Order was to prevent Vezina from unfairly competing with Simplex by bidding for work for which Simplex had already bid while he worked there; it could not reasonably be understood to impose a lifetime ban on Vezina's submitting a bid to any subcontractor with whom Simplex might have an outstanding bid that was submitted long after he left Simplex. ARC, the subcontractor whose business Vezina solicited, did not have an open bid from Simplex at the time that Vezina resigned. And though G & Z had received a bid from Simplex before Vezina resigned, there is no evidence that Vezina sought directly to make a bid to G & Z on the BHS project after his resignation.

The closer question is whether Vezina could be convicted of having disobeyed the TRO's prohibition against "otherwise dealing with" companies having open bids with Simplex. Clearly G & Z was such a company, and there is evidence that Vezina "deal[t] with" G & Z in some sense of that phrase. Vezina appears to have visited G & Z's offices in preparing his bid to ARC. Moreover, as the District Court specifically found, Vezina knew that Simplex had an open bid pending with G & Z on the BHS job, having prepared that bid while working for Simplex. Vezina also knew that ARC was working with G & Z; his fax to ARC refers to "the Gordon & Zoerb job you are working on." According to testimony found credible by the District Court, ARC informed Vezina that it was working on the BHS project with G & Z when it sought his bid.

Other evidence links ARC to G & Z. When ARC ultimately awarded the fire-alarm contract to Simplex, Simplex required ARC to obtain a third-party check from G & Z to cover the selling price because of ARC's weak credit history. Since it is not clear whether ARC's contract with G & Z was a fixed-price or a cost-plus contract, we cannot tell whether any savings realized by ARC from Simplex's lowered price were retained by ARC or passed on to G & Z or to the general contractor ADF. In any event, the relationship between the interests of ARC and G & Z appears quite close.

Despite the relationship between ARC and G & Z, we conclude that neither Vezina's bid to ARC nor his contacts with G & Z in connection with his submission of a bid to ARC may be found to prove beyond a reasonable doubt that he violated the Order's prohibition against "dealing with" G & Z, giving that term a reasonable interpretation appropriate to the purpose of the Court's order. In some contexts, "dealing with" may properly be understood to have a broad meaning in order to accomplish the purposes of a prohibition. For example, when a battered wife obtains an order preventing her abusive husband from visiting her or "dealing with" her in any way, that order might well be applied to mean no contact of any sort. But the TRO in this case was not entered to keep Vezina physically away from G & Z. It was entered to prevent him from competing unfairly with Simplex by "soliciting the business of, or otherwise dealing with, companies having open quotations with Simplex," and "dealing with" (G & Z, which had such an open quotation) must take its meaning from the context that occasioned the Order. *See Terminal Railroad Ass'n v. United States,* 266 U.S. 17, 29, 45 S.Ct. 5, 69 L.Ed. 150 (1924) ("In contempt proceedings for its enforcement, a decree will not be expanded by implication or intendment beyond the meaning of its terms when read in the light of the issues and the purpose for which the suit was brought; and the facts found must constitute a plain violation of the decree so read."); *National Organization for Women v. Operation Rescue,* 37 F.3d 646, 657 (D.C.Cir.1994) ("[T]he meaning of these terms is constrained by the context in which they are actually used in the injunction."); *see also United States v. NYNEX Corp.,* 8 F.3d 52, 54–57 (D.C.Cir.1993) (criminal contempt vacated where defendant's actions in "gray area" between prohibited and permitted conduct).

The primary thrust of the Order was to prevent Vezina from soliciting the business of a firm like G & Z, as long as it had an open bid submitted by Simplex before Vezina's resignation. Though the Order was properly broadened to include those "dealing[s] with" such a firm that might not have been precisely the solicitation of that firm's business, it cannot be applied, for purposes

of a criminal contempt, to punish contacts that are not somewhat related to an effort to solicit the business of G & Z. Vezina was trying to solicit the business of ARC, and nothing in the TRO prevented him from doing so. The relationship between ARC and G & Z brought Vezina close to the area of prohibited dealings with G & Z, and Judge Arcara was understandably concerned about Vezina's conduct. But even taking the evidence at its strongest, as we must on a challenge to sufficiency, *see United States v. Walker,* 142 F.3d 103, 112 (2d Cir.1998), we conclude that his conduct may not be found beyond a reasonable doubt to have violated a clear prohibition of the Court's Order. Since the evidence is insufficient to support the conviction, we need not consider Vezina's alternative argument that the Court's Order was too vague to meet the requirements of Rule 65(d) of the Federal Rules of Civil Procedure.

### Conclusion

The conviction for criminal contempt is vacated.