## INTERSTATE COMMERCE COMMISSION v. UNITED STATES ex rel. ARCATA & MAD RIVER RAILROAD CO.
### No. 5873.

Court of Appeals of the District of Columbia.
Argued March 6, 1933.
Decided April 10, 1933.

Daniel W. Knowlton and H. L. Underwood, both of Washington, D. C., for appellant.

Charles D. Drayton and Robert E. Quirk, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

Arcata & Mad River Railroad Company, which we shall call appellee, operated a narrow gauge line from Arcata, Cal., where it connected with the Northwestern Pacific Railroad, to Korbel, Cal., a distance of about 13 miles. Its entire capital was owned by Northern Redwood Lumber Company, and it was built primarily to transport the lumber company's product for delivery to connecting carriers. Approximately 92 per cent. of its revenues were derived from traffic furnished by the lumber company. The Commission found as a fact that when the timber of the lumber company was exhausted the operation of the line would be abandoned.

Under the President's 1917 proclamation all carriers by railroad, including appellee, were taken under federal control. In June, 1918, the Director General relinquished control of appellee and many other short-line railroads. In August, 1925, appellee filed with the Interstate Commerce Commission a claim under section 204 of the Transportation Act of 1920 (USCA, title 49, c. 3, § 73) for reimbursement in accordance with that section in the amount of $72,401.84 for the period January 1, 1918, to February 29, 1920. The Commission rejected the claim, and appellee filed in the Supreme Court of the District of Columbia a petition for mandamus. The Commission answered, and appellee demurred. The court below sustained the demurrer and granted mandamus, and the case is here on appeal. The facts are undisputed. The prayer of the petition was that the court command and direct the Commission to "ascertain in the manner prescribed in section 204 of the Transportation Act, 1920, the amount by which relator's [appellee's] railway operating income decreased during the

Federal control period as compared with the so-called test period, and to certify said amount to the Secretary of the Treasury for payment."

Section 204 of the Transportation Act was a post-war measure designed to compensate short lines for losses sustained during that part of federal control during which they operated their own property. On behalf of appellee it is argued that section 204 is ministerial and requires the Commission only to ascertain the facts and make the certificate, but that, instead, the Commission dismissed the claim for lack of jurisdiction; that this was wrong, and that, since appellee has no other adequate remedy, mandamus should issue. The Commission, on the other hand, insist that the duty imposed by section 204 is judicial and not ministerial, and that the application of the section requires construction and interpretation by it as a condition precedent to the issue of the certificate, and that it fully heard and decided the claim on the merits.

Section 204 defines "carrier" to mean a railroad "engaged as a common carrier in general transportation, and [which] competed for traffic, or connected, with a railroad under Federal control, and which sustained a deficit in its railway operating income for that portion (as a whole) of the period of Federal control during which it operated its own railroad."

The Commission was required by the act to compare the results of the period when the road was operated by itself with those of the test period, and, if less favorable during the former, i. e., the period of federal control, to certify an award as provided in the statute. The Commission considered appellee's petition and reported the facts in relation to its status, operation, and general character of business, including the fact that, contrary to the general custom of railroads at the time in question, appellee failed to avail itself of the increased rates provided by the Director General's order, and that the effect of this, and of this alone, was to so decrease appellee's net railway operating income during the federal control period as compared with the test period as to create a small deficit. But the loss thus sustained, the Commission reported, was compensated by a gain to the same extent to the lumber company to which it belonged, and so considered was not a real but a fictitious loss which it would be discriminatory and unfair to require the government to pay. As a result of this conclusion, the Commission declared that appellee was not a

carrier within the terms of section 204, and likewise, for the reasons stated, was not entitled to its benefits.

It will thus appear that the grounds on which the Commission rejected the application were twofold: First, that appellee was not engaged in general transportation, and, second, that its self-imposed losses, accruing as they did to the benefit of its owner, were not reimbursable under the act; in other words, that, under the facts as applied to the law, appellee did not come within the terms of the act and was not entitled to the certificate provided in the statute. If this amounted to a dismissal of the claim for want of jurisdiction, and if the admitted facts clearly show that appellee was fairly and squarely within the terms of section 204, and if it be decided that the function of the Commission was purely administrative, it would follow that the lower court was right. If, on the other hand, it be decided that the act imposed on the Commission the power to decide a justiciable controversy, and if the Commission's report shows that it considered and decided the claim on the merits, the decision, whether right or wrong, would be impregnable to attack by mandamus.

A similar question was considered by us in United States ex rel. Abilene & S. R. Co. v. Commission, 56 App. D. C. 40, 8 F.(2d) 901, and there we said, referring to section 204, that the duty of the Commission to ascertain and certify the amount of the deficit to the Secretary of the Treasury was judicial and not ministerial, and therefore not subject to control by mandamus. And still later in Cripple Creek, etc., R. Co. v. Commission, 56 App. D. C. 168, 11 F.(2d) 554, we held that the Commission's refusal to treat combined lines as a "system of transportation" under section 204, though erroneous, was beyond the jurisdiction of courts to correct by mandamus.

Obviously, if we adhere to the position taken by us in these two cases, we shall be obliged to hold that the lower court was in error. But we are told we should not, because since they were decided the Supreme Court has construed section 204 differently in the case of Continental Tie & L. Co. v. U. S., 286 U. S. 290, 52 S. Ct. 529, 530, 76 L. Ed. 1111.

This seems to have been the view taken by the court below.

We have therefore examined the Continental Tie Case to determine whether it goes the length contended for. We think not. That case involved the question whether a

payment received under section 204 by a short-line railroad—very much, we are told, of the same general character as. appellee—was income under the Revenue Act of 1918, and also whether, if income, it should have been returned by the taxpayer railroad in its 1920 tax return. We quote the part of the opinion which is said to control:

"The petitioner kept its accounts upon the accrual basis. The government insists, and the Court of Claims held, that the right to payment having ripened in 1920, the taxpayer should have returned the estimated award under section 204 as income for that year. The petitioner replies that a determination whether it would receive any award under the section and, if so, the amount of it, depended on so many contingencies that no reasonable estimate could have been made in 1920, and that the sum ultimately ascertained should be deemed income for 1923, the year of the award and payment.

"The Transportation Act took effect on February 28, 1920. On June 10 the Interstate Commerce Commission issued general instructions governing the compilation and submission of data by carriers entitled to awards under section 204. The petitioner correctly states that at the date of the act's adoption no railroad had a vested right in any amount; until the Commission made an award nothing could be paid, no proceeding was available to compel an allowance, or to determine the elements which should enter into the calculation. In short, says the petitioner, the carrier had no rights, but was dependent solely upon the Commission's exercise of an unrestrained discretion, and until an award was made nothing accrued. But we think that the function of the Commission under the act was ministerial, to ascertain the facts with respect to the carrier's operating income by a comparison of the experience during the test period with that during the term of federal control. The right to the award was fixed by the passage of the Transportation Act. What remained was mere administrative procedure to ascertain the amount to be paid. Petitioner's right to payment ripened when the act became law. What sum of money that right represented is, of course, a different matter."

■ The language quoted—particularly the concluding paragraphs—goes very far to sustain appellee's position that the Commission's jurisdiction under the act is ministerial and is not, as held by us, a judicial discretion

not controllable by mandamus, but the language used must be read in the light of facts of the particular case in which it was used. In that case the Commission had made an award and the money had been paid to the carrier. The questions before the court were, Was it income, and, if it was, was it returnable for taxes in 1920, when it accrued, or, in 1923, when it was paid? The Supreme Court, in reaching the conclusion it was taxable for the year 1920, said that the problem confronting the carrier there was not different from that of many business concerns which keep accounts on accrual basis, because the carrier, like the ordinary taxpayer, "had in its own books and accounts data to which it could apply the calculations required by the statute and ascertain the quantum of the award within reasonable limits."

It is quite true that the taxpayer urged the view that the question should be decided in the light of conditions confronting it in March of 1921 (the time of the tax return), and that, when so considered, it would not appear that the carrier (taxpayer) would ever get an award at all because in the exercise of its discretion the Commission might decide it was not entitled to one. It is also true that the Supreme Court rejected this contention and said in so many words that on the passage of the Transportation Act the right was fixed and what remained was mere administrative procedure. But, as we have seen, what had happened in the Continental Tie Case was that the carrier had then made its demand and got its money, and the question was not how it had been got, but was it taxable, and, as the Supreme Court said in The Burlington v. Ford, 137 U. S. 387, 392, 11 S. Ct. 138, 140, 34 L. Ed. 731: "There may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it." Considered in the aspect in which we have discussed it, we think that what was meant by the language used in the Continental Tie Case was only that, where the right to the award is admitted, which would include a claimant's status under the act as well as the fact of deficit, the ascertainment of the amount is ministerial only. On the other hand, we think it cannot and should not be construed as a finding that in committing to the Commission the power to administer the provision in question Congress meant to deprive it of all power to exercise judgment and discretion, and, if it did not, we think a decision duly made in the exercise of those duties may not be reviewed by mandamus.

If the decision of the Commission had been grounded solely on the fact that appellee was not a "carrier" within the intent of the act, and if because of that finding it had refused to consider the claim and had based its refusal on that ground, and if the admitted facts had shown that this conclusion was incorrect, a stronger case would perhaps be presented, though we are disposed to think we should have to hold even in such a case that the dismissal of the claim was a decision on the merits rather than a dismissal for lack of jurisdiction, and therefore was not within the doctrine of Interstate Commerce Commission v. U. S. of America ex rel. Humboldt Steamship Co., 224 U. S. 474, 32 S. Ct. 556, 56 L. Ed. 849, where mandamus was held proper to require the Commission to take jurisdiction and hear the controversy on the merits. But we are not confronted with that question here, for that is not the record we are dealing with. As we have seen, the Commission, while at one point in its report expressing "grave doubt" as to whether appellee was a carrier and at another point saying it was not, did in fact, as is shown by their report, proceed to decide the case on the whole merits as fully as if it had reached a different conclusion on the first question. In other words, the Commission decided and reported that appellee was not entitled to the certificate, not only because it was not a "carrier," but also because it had, by its own act and in the interest of its owner, the lumber company, reduced its rates, as a result of which, alone, it was able to show not a real but a fictitious deficit. It is quite true that in reaching this conclusion the Commission had recourse to a definition of the word "deficit," the correctness of which is disputed by appellee, but this is just another argument in favor of the conclusion that the Commission decided the case on the merits rather than on a mistaken theory of lack of jurisdiction.

■ From all of this it is not difficult to see that the subject-matter of this application for mandamus is not really the refusal of the Commission to act, but more correctly, whether the Commission's action is right or wrong. If in such circumstances mandamus should issue, it necessarily would have the effect of a writ of error, and, if this be true, we do not need to cite authority to show that this may not be done.

It follows from what we have said that the decision of the lower court was wrong and should be, and is, reversed.

Reversed.